**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**Reuben Garcia,**

**Plaintiff,**

**vs.**

**City of New Hope, et al.,**

**Defendants.**

**Court File No. 17-cv-03574 (NEB/ECW)**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

## STATEMENT OF FACTS[1]

Plaintiff Reuben Garcia is 52-years-old. (Leyderman Decl., Ex. 1, hereinafter "Garcia Dep." 14.) He has a bachelor's degree from Western Illinois University and a master's degree in secondary education from St. Thomas University. (Garcia Dep. 16.) In February of 2016, the time of the subject incident, Mr. Garcia was a resident of the City of New Hope. (Garcia Dep. 15.) Mr. Garcia was living in New Hope with his wife and two minor children who were attending Robbinsdale Spanish Immersion School. (Garcia Dep. 15, 31-32.) Until a recent career change, Mr. Garcia worked as a public school teacher for 20 years. (Garcia Dep. 16-17.) At the time of the subject incident, Mr. Garcia and his wife owned and operated a vintage shop called Scout Vintage Collective, which

[1] The Court should note that, although judicial review on summary judgment must be based on facts presented in light most favorable to the Plaintiff, the majority of Defendants' allegedly "undisputed facts" is based on their own version of the facts which are actually in dispute.

was also located in the City of New Hope. (Garcia Dep. 30-31.) Other than the subject incident, Mr. Garcia has never been arrested in his life. (Garcia Dep. 19.)

On the afternoon[2] of February 1, 2016, Mr. Garcia was driving near Sonnesyn Elementary School in New Hope while en route to pick up his son from school. (Garcia Dep. 20, 107.) Mr. Garcia was driving the posted speed limit of 20 MPH. (Garcia Dep. 30.) Mr. Garcia saw Defendant Officer Baker standing near the school and she was pointing her finger down, motioning for Mr. Garcia to stop. (Garcia Dep. 25.) Mr. Garcia stopped and rolled down his window to speak with Officer Baker. (Garcia Dep. 25.) Officer Baker was "very angry" and "yelling" at Mr. Garcia that he needed to slow down. (Garcia Dep. 25.) Mr. Garcia explained to Officer Baker that he was driving the posted speed limit, but she continued yelling at him anyway. (Garcia Dep. 25.) Officer Baker did not issue Mr. Garcia a speeding citation. (Garcia Dep. 30.) Mr. Garcia was unable to maintain a conversation with Officer Baker due to her yelling and agitation and eventually left the area. (Garcia Dep. 25.)

Later on the same afternoon, Mr. Garcia was driving by Sonnesyn Elementary School again and he once again saw Officer Baker standing by her squad. (Garcia Dep. 32.) There were no children or crossing guards in the vicinity or near Officer Baker. (Garcia Dep. 33.) As Mr. Garcia drove past Officer Baker, he gave her the middle finger. (Garcia Dep. 36.) Officer Baker immediately got into her squad, activated her emergency lights, and pulled Mr. Garcia over. (Garcia Dep. 36.) Mr. Garcia understood that he was

[2] Mr. Garcia and Defendant Officer Baker had two interactions on February 1, 2016. Mr. Garcia remembers both interactions occurring in the afternoon. (Garcia Dep. 20, 29, 107.)

being pulled over and immediately stopped his vehicle on the side of the road. (Garcia Dep. 36, 44-45.) The remainder of the subject incident was recorded by Mr. Garcia using his cell phone, (Leyderman Decl., Ex. 2), and Officer Baker's squad video, (Leyderman Decl., Ex. 3.)

Officer Baker approached Mr. Garcia's vehicle form the passenger side, at which time Mr. Garcia's rolled down the passenger side window and greeted Officer Baker with a, "Hi." (Ex. 2, 0:00:01.) Mr. Garcia asked, "What are you pulling me over for?" (Ex. 2, 0:00:05.) Officer Baker responded as follows, "You drove by and you flicked me off, and I'm curious as to why you did that." (Ex. 2, 0:00:05.) Mr. Garcia responded, "OK, you have to have a reason to pull me over." (Ex. 2, 0:00:10.) When Mr. Garcia attempted to explain to Officer Baker that flipping her off is not against the law, she replied as follows, "There's a woman out there with her children and the children are out on school patrol and you flicked me off, it's disorderly conduct, absolutely, disorderly conduct." (Ex. 2, 0:00:15.) Officer Baker then requested Mr. Garcia's driver's license, and Mr. Garcia requested a supervisor. (Ex. 2, 0:00:15 – 0:01:20.) As soon as Mr. Garcia pulled out his license, Officer Baker left the passenger side of the vehicle and rushed to the driver's side, refusing to accept his driver's license. (Ex. 2, 0:01:20.) In fact, as soon as Mr. Garcia extended his wallet to Officer Baker, she abruptly walked away. (Ex. 2, 0:01:22.) During this entire initial encounter, Officer Baker kept her right hand on her firearm. (Ex. 2, 0:00:02 – 0:01:22.) Also, Officer Baker made no mention of any traffic or equipment violations and continued to tell Mr. Garcia that he was being pulled over for flipping her off, which she claimed was disorderly conduct. (Ex. 2, 0:00:01 – 0:01:22.)

After leaving the passenger side of Mr. Garcia's vehicle, Officer Baker aggressively rushed around to the driver side as she yelled, "Get out of the fucking car!" (Ex. 3, 02:24.) Officer Baker then yanked the driver-side door open and escorted Mr. Garcia out of the vehicle. (Ex. 3, 02:25.) Officer Baker then shoved Mr. Garcia against his vehicle, grabbed his wallet and driver's license from his right hand, and intentionally threw his property on the ground, causing the contents to spill all over the road. (Ex. 3, 02:30.) Officer Baker then immediately handcuffed Mr. Garcia, at which time Officers Baker, Gust, and Jacobs escorted Mr. Garcia to Officer Baker's squad. (Ex. 3, 03:00.) Once at her squad, Officer Baker once again told Mr. Garcia, "I said you're being detained, right now for disorderly conduct." (Ex. 3, 03:35.) Once at her squad, Officer Baker and Officer Jacobs physically restrained Mr. Garcia while Officer Gust searched his person. (Leyderman Decl., Ex. 4, 04:02.) The Officers then placed Mr. Garcia inside Officer Baker's squad. (Ex. 4, 05:00.)

Once Mr. Garcia was in the squad, Officer Baker debriefed with the other Officers. (Ex. 4, 05:05.) She again made no reference to any traffic or equipment violations and once again confirmed, this time to the Defendant Officers, that she pulled Mr. Garcia over because he flipped her off: "Drove by this afternoon and flicked me off . . . he flicked me off, I got in my car, videotaping the whole time." (Ex. 4, 05:05 (emphasis added).) Mr. Garcia remained inside Officer Baker's squad, handcuffed behind his back, for approximately seven minutes. (Ex. 4, 05:00 – 12:00.) The Officers then detained Mr. Garcia for almost two more minutes after removing him from the squad, at

which time Mr. Garcia was released with a citation. (Ex. 4, 13:45.) Mr. Garcia was detained for approximately 13 minutes total. (Ex. 3, 00:00 – 13:00.)

While Mr. Garcia was sitting in the back of the squad, Officer Baker issued him a citation. (Leyderman Decl., Ex. 5.) In addition to unlawfully charging Mr. Garcia with disorderly conduct, Officer Baker also added a false charge of "Tinted/Covered/Obstructed" license plate. (Ex. 5.) Despite Mr. Garcia's denial of this false violation in his discovery responses, (Leyderman Decl., Ex. 6, p. 1, Req. No. 4), and Defendants' failure to discuss or even mention this issue during Mr. Garcia's deposition, (see Garcia Dep. 1-115), Defendants now pretend that this false violation is an undisputed fact. (Defs.' Mem. 3, 13.) Mr. Garcia did not have a cover over his front or rear license plate during his interactions with Officer Baker on February 1, 2016. (Garcia Decl.) Mr. Garcia also did not have a frame over either the front or rear license plate that covered any letters, numbers, tabs, stickers, or the name of the state of origin. (Garcia Decl.)

As emphasized above, Officer Baker admitted, in a number of conversations with Mr. Garcia and her fellow officers, that she stopped Mr. Garcia only because he flipped her off. In her police report, Officer Baker likewise admits, "I explained that I stopped him for 'flicking me off'." (Ex. 7, p. 3.) While Officer Baker was in the process of stopping Mr. Garcia over, she dictated to herself the reason for the traffic stop. (Ex. 3, 00:30 – 00:45; Leyderman Decl., Ex. 8, hereinafter "Baker Dep." 80.) Here, again, Officer Baker made no mention of any equipment violation and once again confirmed that she was stopping Mr. Garcia for flipping her off. (Ex. 3, 00:30 – 00:45; Baker Dep.

80-81.) Finally, during her deposition, Officer Baker reluctantly admitted that, had Mr. Garcia not flipper her off, she would not have pulled him over that day. (Baker Dep. 103-105.) Despite all of the evidence to the contrary, including her deposition admission, Officer Baker then changed her testimony and testified that she would have stopped Mr. Garcia even if he had not given her the finger during the second incident. (Baker Dep. 105-106.) Officer Baker then changed her testimony again and testified that she is unsure as to whether she would have pulled him over had Mr. Garcia not given her the finger. (Baker Dep. 106-107.) Shortly prior during her deposition testimony, Officer Baker testified that, during the second encounter, had Mr. Garcia not given her the finger, she would not have pulled him over. (Baker Dep. 64.) Officer Baker admitted during her deposition testimony that she would never resort to violence against a disgruntled citizen who gives her the finger. (Baker Dep. 84-86.)

As a result of Officer Baker's citation, Mr. Garcia had to hire a criminal defense attorney, whom he paid $1,600.00. (Garcia Dep. 110.) Mr. Garcia told his criminal defense attorney that he wanted to have a trial, but the attorney threatened Mr. Garcia with jail time and demanded more money. (Garcia Dep. 56, 109-110.) The attorney refused to take the case to trial without additional payment, and Mr. Garcia could not afford to pay the attorney additional funds to take the case to trial. (Garcia Dep. 109-110.) The criminal defense attorney instructed Mr. Garcia to take a defensive driving course and write an apology to Officer Baker. (Garcia Dep. 56.) The attorney threatened that Mr. Garcia will go to jail if he does not comply with his instructions. (Garcia Dep. 56.) Mr. Garcia, out of fear, complied with his criminal attorney's demands and prepared an

unsigned and undated three-line apology note that he gave to his attorney. (Garcia Dep. 56; Leyderman Decl., Ex. 9.) Officer Baker interpreted Mr. Garcia's apology letter as a "joke," (Baker Dep. 126), just as he intended it.

On April 7, 2017, the prosecuting attorney agreed to a continue Mr. Garcia's criminal case for dismissal. (Leyderman Decl., Ex. 10.) The only condition for the continuance was that Mr. Garcia was not to commit a same or similar offense. (Ex. 10.) Immediately after court, Mr. Garcia filed an Internal Affairs complaint against Officer Baker, wherein he complained that he was unlawfully stopped and prosecuted for giving her the finger. (Garcia Dep. 58, 112-13; Leyderman Decl., Ex. 11.) On May 9, 2016, Tim Fournier, New Hope Chief of Police, determined that Mr. Garcia's complaint against Officer Baker was "not sustained." (Leyderman Decl., Ex. 12.) Chief Fournier further determined that the "traffic stop was justified." (Ex. 12.) The criminal charges against Mr. Garcia were ultimately dismissed. (Garcia Dep. 54, 57.) Mr. Garcia testified that, had his criminal attorney not demanded additional payment, he would have taken the case to trial and rejected the prosecutor's offer to suspend prosecution. (Garcia Dep. 112.)

As a result of Defendants' actions, Mr. Garcia suffered stress, fear, shame, humiliation and loss of freedom and liberty. (Garcia Dep. 79-85-86, 104.) Mr. Garcia testified that, during the subject incident, he was worried that Officer Baker would shoot him and feared for his life. (Garcia Dep. 36, 85-86.) Mr. Garcia suffered a physical injury to his right wrist due to the handcuffing, which required medical treatment and took approximately two months to resolve. (Garcia Dep. 76.) Mr. Garcia was also subjected to

a wrongful criminal prosecution and incurred $1,600 in attorney's fees. (Garcia Dep. 110.)

Defendants now move for summary judgment, arguing that their actions against Mr. Garcia were justified and that they are entitled to qualified and official immunity. As explained in detail below, Defendants' arguments are meritless and their motion should be denied in its entirety.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## STANDARD OF REVIEW FOR QUALIFIED IMMUNITY

Police officers are entitled to qualified immunity unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). To

overcome the defendants' qualified immunity claims, the plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right; and, (2) the right was clearly established at the time of the deprivation. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010). This Court can exercise its sound discretion to determine which qualified immunity prong to address first. *Pearson*, 129 S. Ct. at 818. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotations omitted); *see also Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012).

## ARGUMENT

### I. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT UNLAWFUL SEARCH AND SEIZURE AND EXCESSIVE FORCE CLAIMS (COUNT 2).

#### A. Officer Baker's Traffic Stop of Mr. Garcia Violated the Fourth Amendment.

"The Fourth Amendment safeguards the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001). "There are three categories of police encounters: (1) consensual communications involving no coercion or restraint, (2) *Terry* stops — minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale

arrests that must be supported by probable cause." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144-45 (8th Cir. 2007).

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "To justify a limited and momentary detention of a person without violating the Fourth Amendment's proscription against an unreasonable seizure, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Andrews v. Fuoss*, 417 F.3d 813, 817 (8th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Whether such a seizure is reasonable 'must be determined on the totality of the circumstances and is to be judged from the perspective of a reasonable officer on the scene without regard to the underlying intent or motivation.'" *Id.* (quoting *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999)).

A police officer can lawfully arrest a suspect without a warrant when the police officer has probable cause to believe that the suspect has committed a crime. *Baribeau*, 596 F.3d at 474. Probable cause to arrest a suspect exists when the facts and circumstances within the officer's knowledge and of which the officer had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Id.* "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (internal quotations omitted). A "reasonable

ground for belief" means "more than bare suspicion," but "less than evidence which would justify . . . [a] conviction." *Id.* (internal quotations omitted). "It is fundamental that an arrest violates the Fourth Amendment when there exists no . . . probable cause that an individual is engaged in criminal activity." *Gainor v. Rogers*, 973 F.2d 1379, 1387 (8th Cir. 1992).

**1. Officer Baker did not have probable cause or reasonable suspicion to detain or arrest Mr. Garcia for a traffic/equipment violation.**

Defendants argue in their supporting memorandum that Officer Baker's traffic stop of Mr. Garcia was justified because she had probable cause or reasonable suspicion to detain Mr. Garcia to investigate the false equipment (license plate) violation pursuant to Minn. Stat. § 169.79, subd. 7. (Defs.' Mem. 13.) This argument is meritless because Mr. Garcia denies that his license plate was covered with an illegal cover or frame during the subject incident. (Garcia Decl.; Ex. 6, p. 1, Req. 4.) Mr. Garcia also testified that he drove the posted 20 MPH speed limit during the first encounter, (Garcia Dep. Garcia Dep. 30), and Officer Baker does not even allege that Mr. Garcia was speeding during the second encounter. Thus, genuine issues of material fact preclude summary judgment as to the false equipment violation. *See Swipies v. Kofka*, 348 F.3d 701, 704 (8th Cir. 2003) (affirming denial of summary judgment because the predicate facts material to the qualified immunity issue were in dispute); *Kukla v. Hulm*, 310 F.3d 1046, 1049 (8th Cir. 2002) ("[I]f the arrestee challenges the officer's description of the facts and presents a factual account that would not permit a reasonable officer to make an arrest, then there is a material factual dispute precluding summary judgment."); *Lambert v. City of Dumas*,

187 F.3d 931, 935 (8th Cir. 1999) ("[I]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment."); *Gainor*, 973 F.2d at 1385 ("[W]here there are genuine issues of material fact surrounding an arrestee's conduct it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law.").

**2. Officer Baker did not have probable cause or reasonable suspicion to detain or arrest Mr. Garcia for disorderly conduct.**

Defendants' only other justification for detaining Mr. Garcia is their claim that Officer Baker had reasonable suspicion to detain Mr. Garcia for disorderly conduct based on the fact that Mr. Garcia drove past Officer Baker twice in one day and flipped her off during the second encounter. As explained below, this argument is also baseless.

Minnesota's disorderly conduct statute provides, in relevant part, as follows:

> Whoever does any of the following in a public or private place . . . knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct, which is a misdemeanor: . . . engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn. Stat. § 609.72, subd. 1(3). Although the City of New Hope Police Department seems oblivious to these developments, the Minnesota Supreme Court has held, for at least the last 40 years, that the disorderly conduct statute cannot be used to punish offensive speech/conduct unless the speech/conduct constitutes "fighting words." *In re Welfare of S.L.J.*, 263 N.W.2d 412, 419 (Minn. 1978). What's more, Minnesota courts

have held that swearing at a police officer is not disorderly conduct, even when children are present, *In re Welfare of M.A.H.*, 572 N.W.2d 752 (Minn. Ct. App. 1997), and the Eighth Circuit recently has held that scaring a child in the course of engaging in First Amendment conduct does not constitute disorderly conduct, *Baribeau*, 596 F.3d at 478. Defendants' obvious ignorance of this clearly established state and federal law, which is outlined in detail below, is not a ticket to qualified immunity or summary judgment.

"The First Amendment protects . . . criticism and challenge directed at police officers." *City of Huston v. Hill*, 482 U.S. 451, 461 (1987); *see also Norwell v. City of Cincinnati*, 414 U.S. 14, 94 (1973); *Gainor v. Rogers*, 973 F.2d 1379, 1388 (8th Cir. 1992). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462-63. "It is . . . fundamental that a lawful arrest may not ensue where the arrestee is merely exercising his First Amendment rights." *Gainor*, 973 F.2d at 1387; *see also Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010).

"When protected free speech is involved, the offense of disorderly conduct has been interpreted narrowly and as restricting only 'fighting words.'" *State v. Peter*, 798 N.W.2d 552, 554 (Minn. Ct. App. 2011.) This holding was announced for the first time 40 years ago in *S.L.J.*: "Although § 609.72, subd. 1(3), clearly contemplated punishment for speech that is protected under the First and Fourteenth Amendments, we can uphold its constitutionality by construing it narrowly to refer only to 'fighting words.'" 263 N.W.2d 412, 419 (Minn. 1978). "Fighting words" are words that "tend to incite an immediate breach of the peace" or are "inherently likely to provoke violent reaction," or

"hav[e] an immediate tendency to provoke retaliatory violence or tumultuous conduct by those to whom such words are addressed." *Id.* at 419.

Minnesota courts have consistently held that a citizen cannot be charged with disorderly conduct for merely yelling hostile, vulgar, and offensive statements at a police officer. For example, in *S.L.J.*, a 14-year-old girl was adjudicated delinquent for disorderly conduct after yelling "Fuck you pigs," to two police officers. 263 N.W.2d at 415. The supreme court reversed the delinquency on First Amendment grounds because her statements were not "fighting words" and constituted free speech protected under the First Amendment. *Id.* at 420.

Another instructive case is *In re Welfare of M.A.H.*, where the allegations included yelling obscenities at police officers, such as "What the f*** are you gonna do about it? We can be here if we f***in' want to !" and "This is bulls***! This whole thing is f***ed up! We can do anything we f***in' want to do!" 572 N.W.2d 752, 755 (Minn. Ct. App. 1997). There, again, the court determined that the yelling of obscenities at police officers was protected under the First Amendment because the conduct did not constitute "fighting words" and that the disorderly conduct statute could not be used to punish such protected speech. *Id.* at 758-59. The fact that numerous other children were present while the defendants in *M.A.H.* yelled obscenities at police officers, *id.* at 755, did not affect the court's decision in that case, *id.* at 758-60. *M.A.H.* explained that Minnesota's disorderly conduct statute cannot be used as a tool to regulate rudeness: "To avoid interfering with first amendment rights, this statute should not be used to combat rudeness or for social engineering." *Id.* at 757. *M.A.H.* emphasized that, in order to apply the disorderly conduct

statute to curtail offensive language against police officers consistent with the First Amendment, the offensive language must be "inherently likely to provoke retaliatory violence by the police at whom the insult was directed or . . . intended to and likely to produce imminent lawless action by the surrounding circumstances." *Id.* at 758.

Additional recent caselaw dealing with the disorderly conduct statute and the "fighting words" doctrine is also instructive. For example, in *State v. Peter*, 798 N.W.2d at 553, the defendants were two animal rights activists who were prosecuted for disorderly conduct after protesting outside Ribnick Fur in downtown Minneapolis. During trial, the owner of Ribnick Fur testified that the defendants "spoke about the business, fur, and killing animals, but that they also yelled that they knew where he lived; they knew where his elderly mother lived; and they knew his vehicle license plate number." *Id.* The owner of the store also testified that the defendants were "'very loud and very angry' and that they yelled on and off for about a half hour until police arrived." *Id.* Another witness in *Peter* testified that the defendants in that case were "loud, that their 'tone was very aggressive and angry,' that their yelling 'got under . . . [his] nerves,' and that they disrupted his work with the noise." *Id.* at 553-54.

As these facts show, the defendants in *Peter* were loud and disruptive for an extended period of time and even threatened the safety of the store owner and his elderly mother. The defendants' actions in *Peter*, on their face, also clearly violated the disorderly conduct statute. With these facts in mind, the Minnesota Court of Appeals reversed the defendants' convictions because their speech and conduct, although loud and boisterous, were protected under the First Amendment. *Id.* at 556. This Court reversed

the protestors' conviction on two grounds: (1) because the protestors did not engage in "fighting words" and (2) because the protestors' loud and boisterous yelling constituted expressive conduct which was inextricably linked to a message protected under the First Amendment. *Id.* at 556-57. This Court's reasoning in *Peter* is instructive here:

> The other complaint about appellants' conduct involved the manner or the delivery of their speech, in which appellants were so loud and angry that they disturbed and annoyed others. But appellants yelled in their natural voices, without the use of any sound amplification equipment. Their protest occurred on a downtown Minneapolis street, during afternoon rush hour, in a mixed use neighborhood that included businesses, residences, and entertainment establishments. Loud and even boisterous conduct is protected under Minnesota law, when that conduct is "expressive and inextricably linked to [a] protected message."

*Id.* at 556 (citing *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010)).

In *Baribeau v. City of Minneapolis,* 596 F.3d 465, 478 (8th Cir. 2010), the issue was whether police had probable cause to arrest, for disorderly conduct, a number of individuals dressed as zombies who were protesting consumerism in downtown Minneapolis. The protesters played amplified music, broadcast announcements, came within three feet of bystanders, and frightened at least one child. *Id.* at 471. Based on its analysis of Minnesota's interpretation of the disorderly conduct statute, including the caselaw cited above as well as the "fighting words" doctrine, the Eighth Circuit concluded that the *Baribeau* protesters were engaged in "protected expressive conduct" and thus concluded that the police lacked probable cause to arrest the protesters for violating the disorderly conduct statute. *Id.* at 477. The court in *Baribeau* further determined that the plaintiffs' costumes, music, statements, and erratic walking could not

be the basis for a disorderly conduct arrest because their conduct was "'inextricably linked'" to their anti-consumerism message. *Id.*

In *State v. Machholz,* 574 N.W.2d 415, 417-18 (Minn. 1998), the Minnesota Supreme Court also reversed the defendant's conviction on First Amendment grounds. *Machholz* involved a defendant riding a horse through a gay pride gathering, swinging a rope, and yelling hateful comments at the crowd. *Id.* Specifically, the defendant in *Machholz* yelled the following statements at the crowd: "You're giving us AIDS!"; "You're spreading your filth!"; "There are no homosexuals in heaven!"; and "You're corrupting our children!" *Id.* at 422. The Minnesota Supreme Court reversed the harassment conviction, holding that the words used by the defendant were protected under the First Amendment. *Id*. The court concluded that while the defendant's statements were offensive and obnoxious, they did not constitute fighting words.

The above-discussed precedent makes clear that, in order for Officer Baker to have lawfully detained Mr. Garcia to investigate a possible disorderly conduct violation, Officer Baker must have had reasonable suspicion that Mr. Garcia was engaged in "fighting words." *See S.L.J.*, 263 N.W.2d at 419. But, under the facts presented in this case as well as the Minnesota courts' interpretation of the disorderly conduct statute, there was no basis whatsoever for Officer Baker to believe that Mr. Garcia's act of giving her the finger constituted "fighting words." *See S.L.J.*, 263 N.W.2d at 419.

As the Minnesota Court of Appeals emphasized in *M.A.H.*, in order to apply the disorderly conduct statute against a citizen who is engaged in offensive conduct/language, the offensive conduct/language must be "inherently likely to provoke

retaliatory violence by the police at whom the insult was directed or . . . intended to and likely to produce imminent lawless action by the surrounding circumstances." 572 N.W.2d at 758. Officer Baker admitted during her deposition testimony that she would never resort to violence against a disgruntled citizen who gives her the finger. (Baker Dep. 84-86.) There is likewise no other evidence in this case to suggest that Mr. Garcia's momentary gesture was likely to produce "imminent lawless action by the surrounding circumstances." *See id.* In fact, Officer Baker testified that she was in such a rush to get into her squad to chase down Mr. Garcia that she did not even take time to look at the reaction of the children she alleges were in the area and capable of seeing Mr. Garcia's gesture. (Baker Dep. 70-71, 84.) Officer Baker testified that she later spoke with the young girl who was standing on the corner with her when Mr. Garcia drove by and displayed the finger, and the little girl denied seeing Mr. Garcia's gesture. (Baker Dep. 71-72.)

Officer Baker has now generated a variety of meritless excuses for her actions. But the real reason for her seizure of and hostility towards Mr. Garcia, as evidenced by her behavior in the cell phone and squad video, is that she became offended and, unable to control herself, chased down Mr. Garcia, initiated an unjustified traffic stop, and then proceeded to give Mr. Garcia some street justice. The true and honest reason for Officer Baker's actions is precisely what she told Mr. Garcia when she approached his vehicle: "You drove by and you flicked me off, and I'm **curious** as to why you did that." (Ex. 2, 0:00:05 (emphasis added).) But the Eighth Circuit has made clear that a "law enforcement officer's mere hunch does not amount to reasonable suspicion." *United*

*States v. Wheat*, 278 F.3d 722, 732 (8th Cir. 2001). "Reasonable suspicion must derive from more than an inchoate and unparticularized suspicion or hunch." *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992). "In determining whether the officer acted reasonably . . ., due weight must be given, not to h[er] inchoate and unparticularized suspicion or hunch, but to the specific reasonable inferences which [s]he is entitled to draw from the facts in light of h[er] experience." *Terry*, 392 U.S. at 27. A seizure based on a "mere whim, caprice or **idle curiosity**" is objectively unreasonable and violates the Fourth Amendment. *Schumacher v. Halverson*, 467 F.Supp.2d 939, 949 (D. Minn. 2006) (emphasis added); *see also State v. Waddell*, 655 N.W.2d 803, 809 (Minn. 2003) ("Reasonable, articulable suspicion requires a showing that the stop was not the product of mere whim, caprice, or **idle curiosity**.") (emphasis added); *United States v. Billups*, 442 F.Supp.2d 697, 707 (D. Minn. 2006) (finding traffic stop unconstitutional because it was "based upon mere hunch, caprice, whim, or **curiosity**.") (emphasis added). Here, while Officer Baker was subjectively offended and "curious," she was prohibited from detaining Mr. Garcia for disorderly conduct because there was no reasonable suspicion to believe that Mr. Garcia's momentary display of his middle finger constituted "fighting words."

In her briefing, Officer Baker argues that reasonable suspicion was present because Mr. Garcia engaged her twice in one day (once in the morning and once in the afternoon) and because he displayed the middle finger to her in a school zone with children present. (Defs.' Mem. 12-13.) Defendants claim that Mr. Garcia engaged in "odd and erratic behavior during his morning and afternoon interactions with Officer Baker in

front of a school with children present." (Defs.' Mem. 12.) Defendants further argue that, "[d]uring the morning interaction, Garcia intentionally stopped his car next to a crosswalk in front of a school, where children were trying to cross and proceeded to verbally accost Officer Baker, arguing with her regarding the speed limit." (Defs.' Mem. 12.)

These arguments are completely baseless because, as with the majority of the remainder of Defendants' "undisputed facts," Defendants are relying on their own version of **disputed** facts to support their self-serving legal conclusions. Mr. Garcia denies engaging in any "odd or erratic behavior" and he testified that he drove the posted speed limit of 20 MPH during the first encounter and that Officer Baker herself "motion[ed] for [him] to stop." (Garcia Dep., 25, 30.) Mr. Garcia stopped, as he was directed by Officer Baker, and rolled down his window to speak with her. (Garcia Dep. 25.) Officer Baker was "very angry" and "yelling" at Mr. Garcia that he needed to slow down. (Garcia Dep. 25.) Mr. Garcia explained to Officer Baker that he was driving the posted speed limit, but she continued yelling at him anyway. (Garcia Dep. 25.) Mr. Garcia was unable to maintain a conversation with Officer Baker due to her yelling and agitation and eventually left the area. (Garcia Dep. 25.)

Then, in the afternoon, after Officer Baker unlawfully detained Mr. Garcia without reasonable suspicion, she yelled, "Get out of the fucking car!" as she rushed around Mr. Garcia's vehicle, threw and scatted his property on the ground, and then handcuffed and detained him in the back of her squad while she hummed to some unknown tune and pretended not to hear him complaining in the back seat. (Ex. 3.) Officer Baker also

admitted, in her deposition, that the encounters with Mr. Garcia occurred in a busy area of New Hope and it was not unusual or surprising to see the same person drive through there twice in the same day. (Baker Dep. 65-67.) The facts, when properly viewed in light most favorable to Mr. Garcia, demonstrate that it was Officer Baker, not Mr. Garcia, who was engaged in "odd or erratic behavior" during both encounters.

Defendants' argument that the presence of children somehow contributed to reasonable suspicion is likewise misguided. First, Defendants once again ignore Mr. Garcia's disputed facts and apply their own. During his deposition, Mr. Garcia testified that no crossing guards or children were present in the area when he gave Officer Baker the middle finger. (Garcia Dep. 33.) Thus, Officer Baker's argument that children were present at the time of the second incident, which contributed to her finding of reasonable suspicion, should be rejected on these grounds alone.

However, even if children were present, reasonable suspicion was still lacking because the "fighting words" doctrine, as applied to the disorderly conduct statute by the Minnesota Supreme Court, does not distinguish between situations where children are/are not present. As already explained above, other children were present during the offensive and profane comments at issue in *M.A.H.*, yet the Minnesota Court of Appeals still determined that the comments were not fighting words, were protected under the First Amendment, and were not subject to punishment using the disorderly conduct statute. 572 N.W.2d at 758-60. In *Baribeau*, children were not only present but at least one child got scared as a result of the protestors' dress and actions. 596 F.3d at 471. But the Eighth Circuit still determined that the protestors were not engaged in "fighting words" and

determined that they could not be subjected to arrest for disorderly conduct because they were engaged in "protected expressive conduct" that was "inextricably linked" to their protected message of anti-consumerism. *Id.* at 477.

As the above caselaw makes clear, Defendants' focus on the presence of children is flawed and misguided because it is the presence of "fighting words," not presence of children, that must be used to determine whether a citizen engaged in offensive conduct/language can be subjected to investigation and arrest for disorderly conduct. In the present case, just like in *S.L.J.* and *M.A.H.*, Mr. Garcia was not engaged in "fighting words" when he gave Officer Baker the middle finger. Also, as the plaintiffs in *Baribeau*, Mr. Garcia's act of giving Officer Baker the middle finger, even if in the presence of children, constituted "protected expressive conduct" that was "inextricably linked" to his protected message of disgruntlement with Officer Baker. Based on the facts and binding legal precedent set forth above, Mr. Garcia's act of giving Officer Baker the middle finger did not rise to the level of reasonable suspicion or probable cause necessary to justify Officer Baker's seizure of Mr. Garcia. For all of these reasons, Officer Baker's unjustified seizure of Mr. Garcia violated the Fourth Amendment.

### B. Defendants Engaged in Excessive Force by Handcuffing Mr. Garcia Without Justification.

"The Fourth Amendment safeguards the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001). The right to be free from excessive force is included under the Fourth Amendment's prohibition against

unreasonable seizures of the person. *Guite v. Wright,* 147 F.3d 747, 750 (8th Cir.1998). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Howard v. Kan. City Police Dep't,* 570 F.3d 984, 989 (8th Cir. 2009) (internal quotation marks omitted).

In deciding whether the amount of force used by a police officer was constitutionally excessive, the Court must apply an "objective reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 392 (1989); *Samuelson v. City of New Ulm,* 455 F.3d 871, 875 (8th Cir. 2006). Objective reasonableness depends on the facts and circumstances of the case, "'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Mann v. Yarnell,* 497 F.3d 822, 825-26 (8th Cir. 2007) (quoting *Graham,* 490 U.S. at 394). "An officer's use of force violates the Fourth Amendment when it is objectively unreasonable, given the facts and circumstances of the particular case, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Chambers v. Pennycook,* 641 F. 3d 898, 905-06 (8th Cir. 2011) (quoting *Graham,* 490 U.S. at 396). "Not every push or shove . . . violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them." *Rohrbough v. Hall,* 586 F.3d 582, 585 (8th Cir. 2009) (internal quotation marks omitted). The facts of this case, viewed in light most favorable

to Mr. Garcia, show that Defendants violated Mr. Garcia's Fourth Amendment right to remain free from excessive use of force when they handcuffed him without justification.

Applying the *Graham* factors to the facts viewed in light most favorable to Mr. Garcia, Defendants' use of handcuffs on Mr. Garcia was objectively unreasonable and excessive. First, as already explained above, Mr. Garcia did not commit any crimes at any time throughout the subject incident and was not engaged in any illegal or suspicious activities. Second, Mr. Garcia did not pose a threat to the safety of the Defendant Officers at the time he was handcuffed, and he was not resisting arrest or attempting to evade arrest by flight. Thus, the *Graham* factors weigh in favor of a finding of excessive force.

The Eighth Circuit has recently held that a police officer may not use any degree of force on a citizen who has not committed a crime and who is not interfering with the police in any way. *Hemphill v. Hale*, 677 F.3d 799, 801 (8th Cir. 2012). This Court has applied this rule to deny qualified immunity to police officers who use force when, as in *Hale*, no use of force at all is permissible under the circumstances. *See Nguyen v. Lokke*, No. 11-3225, 2013 WL 4747459, at *3 (D. Minn. Sept. 4, 2013) ("When there is no right to seize a citizen – that is, when there is no right to detain a citizen even momentarily – then there is also no right to use force against that citizen."); *Smith v. Appledorn*, No. 11-2966, 2013 WL 451320, at *3 (D. Minn. Feb. 6, 2013) ("[B]efore a police officer can use physical force, the arrest or investigatory stop itself must be justified.").

In *Der v. Connolly*, this Court recently considered whether the application of handcuffs during an illegal arrest constitutes excessive force. 825 F.Supp.2d 991, 997 (D. Minn. 2010). This Court determined that it does and denied the defendant officer's

motion for summary judgment: "[The plaintiff] was not posing a danger to herself or to anyone else and . . . [the officer] was not justified in handcuffing her or in using force to do so. . . . [The officer's] motion for summary judgment on these claims is denied." *Id.*; *see also Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) ("[E]ven de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect."); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) ("[W]here there is no need for force, any force used is constitutionally unreasonable . . . Gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment.").

In *El-Ghazzawy v. Berthiaume*, the Eighth Circuit considered the use of handcuffs in the context of an investigative *Terry* stop. 636 F.3d 452, 457 (8th Cir. 2011). There, the court explained that "[t]he use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Id.* "The use of handcuffs is greater than a de minimus intrusion and thus requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* "[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restrains are necessary for some other legitimate purpose." *Id.* In *El-Ghazzawy*, the court determined that the handcuffing of the suspect in that case was unconstitutional because there was no evidence that the handcuffing was necessary for officer safety. *Id.* at 458-59.

In the present case, considering the facts in light most favorable to Mr. Garcia, the Defendant Officers had no legitimate justification for detaining or using any degree of force against Mr. Garcia, and their handcuffing of Mr. Garcia was thus unlawful. In fact, at the time he was handcuffed, Mr. Garcia had his wallet and license out and was holding them in his hand. (Ex. 2; Ex. 3.) Furthermore, the Defendant Officers had no reason to fear for their safety or to believe that Mr. Garcia was armed or dangerous. Mr. Garcia was being detained without justification and, although he was questioning Officer Baker's actions and motives, he did ultimately remove his identification and offered it to Officer Baker. Accordingly, the Defendant Officers used excessive and unnecessary force, in violation of the Fourth Amendment, when they handcuffed Mr. Garcia behind his back even though Mr. Garcia did not commit a crime and did not present any reasonable danger to the officers.

### C. Defendants are Not Entitled to Qualified Immunity Because Their Unconstitutional Seizure and Use of Force Against Mr. Garcia Violated Clearly Established Fourth Amendment Precedent.

The second prong of the qualified immunity analysis is whether the police officers' actions violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Baribeau*, 596 F.3d at 478. "The fundamental question under this analysis is whether the state of the law, as it existed at the time of the arrest, gave the defendants 'fair warning' that the arrest was unconstitutional." *Baribeau*, 596 F.3d at 478 (quoting *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007)). "For a constitutional right to be clearly established,

its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Pelzer*, 536 U.S. at 739. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted). "The Supreme Court . . . has made it clear that there need not be a case with 'materially' or 'fundamentally' similar facts in order for a reasonable person to know that his or her conduct would violate the Constitution." *Selk*, 508 F.3d at 875 (quoting *Pelzer*, 536 U.S. at 736).

**1. Unlawful seizure for disorderly conduct without reasonable suspicion of "fighting words" clearly established.**

In February of 2016, it was clearly established that an investigatory stop/detention of a citizen that was unsupported by reasonable suspicion violated the Fourth Amendment. *Terry*, 392 U.S. at 21; *Andrews*, 417 F.3d at 817. At the same time, it was also clearly established that an investigative stop that is based on unparticularized suspicion, a mere hunch, whim, caprice, or idle curiosity violates the Fourth Amendment. *Wheat*, 278 F.3d at 732; *Weaver*, 966 F.2d at 394; *Schumacher*, 467 F.Supp.2d at 949; *Billups*, 442 F.Supp.2d at 707; *see also Waddell*, 655 N.W.2d at 809. Finally, Minnesota caselaw clearly established, prior to February of 2016, that offensive speech or conduct, notwithstanding presence/absence of children, does not constitute disorderly conduct unless the speech/conduct constitutes "fighting words," which was obviously lacking in this case. *S.L.J.*, 263 N.W.2d at 419; *M.A.H.*, 572 N.W.2d at 758-59; *Peter*, 798 N.W.2d

at 556-57; *Baribeau*, 596 F.3d at 477. Thus, Defendants violated Mr. Garcia's clearly established constitutional right to remain free from unreasonable seizures of his person when they detained Mr. Garcia without reasonable suspicion of "fighting words" and based on nothing more than Officer Baker's curiosity. Accordingly, Defendants are not entitled to qualified immunity on Mr. Garcia's unlawful seizure claim.

**2. Excessive force through unjustified handcuffing clearly established.**

"'The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person.'" *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (quoting *Guite*, 147 F.3d at 750). "A section 1983 action is supported when a police officer violates this constitutional right." *Id.* (citation omitted). The dispositive inquiry when considering the "clearly established" prong is whether the state of the law at the time of the violation gave the Defendant Officers "fair warning" that their alleged conduct amounted to excessive force and was therefore unconstitutional. *Orsak v. Metropolitan Airports Comm'n*, 675 F. Supp. 2d 944, 959 (D. Minn. 2009). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brown v. City of Golden Valley,* 574 F.3d 491, 499 (8th Cir. 2009). "There is no requirement that the very action in question has previously been held unlawful, but rather, in the light of pre-existing law the unlawfulness must be apparent." *Rohrbough,* 586 F.3d at 587 (citation and internal quotation marks omitted).

Here, Mr. Garcia's constitutional right to be free from unjustified handcuffing was clearly established in February of 2016. *See Moore*, 514 F.3d at 759 (right to be free from

excessive use of force is clearly established); *Hale*, 677 F.3d at 801 (right to be free from any degree of force during an unlawful seizure clearly established in 2012); *Der*, 825 F.Supp.2d at 997 (use of handcuffs during unlawful detention prohibited); *El-Ghazzawy*, 636 F.3d at 457-59 (right to be free from unjustified use of handcuffs during *Terry* stops, when the officers have no reason to believe that the suspect is armed or dangerous, is clearly established); *Brown*, 574 F.3d at 499 ("Force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."); *Nguyen*, 2013 WL 4747459, at *3 (no use of force is permitted during unlawful seizure); *Smith*, 2013 WL 451320, at *3 (no use of force permitted during unlawful seizure). Thus, it was clearly established, in February of 2016, that the Defendant Officers violated Mr. Garcia's constitutional right to remain free from excessive use of force when they handcuffed him behind his back even though no crime had been committed, he was being detained for a non-violent misdemeanor, and there was no reason to believe, at the time of the handcuffing, that he was armed or dangerous. Thus, Defendants are not entitled to qualified immunity on Mr. Garcia's excessive force claim.

## II. OFFICER BAKER IS NOT ENTITLED TO QUALIFIED IMMUNITY ON MR. GARCIA'S FIRST AMENDMENT RETALIATION CLAIM (COUNT 1).

In broad terms, the First Amendment "protects the right to be free from government abridgment of speech."*Ysura v. Pcatello Educ. Ass'n*, 129 S.Ct. 1093, 1098

(2009). "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Garcia v. City of Trenton,* 348 F.3d 726, 729 (8th Cir.2003).

"To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) [h]e engaged in a protected activity, (2) the government official took adverse action against h[im] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004). In short, the plaintiff must show that the government official "took the adverse action because the plaintiff engaged in the protected speech." *Id.* "The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Garcia*, 348 F.3d at 728. In cases involving retaliatory arrests, "retaliation need not have been the sole motive, but it must have been a 'substantial factor' in the decision to arrest."*Baribeau*, 596 F.3d at 481. In addition, the causal connection is generally a question for the jury, unless the question of causation is "so free from doubt as to justify taking it from the jury." *Revels,* 382 F.3d at 876 (citations omitted).

"The First Amendment protects . . . criticism and challenge directed at police officers." *City of Huston v. Hill*, 482 U.S. 451, 461 (1987); *see also Norwell v. City of*

*Cincinnati*, 414 U.S. 14, 94 (1973); *Gainor v. Rogers*, 973 F.2d 1379, 1388 (8th Cir. 1992). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462-63. "It is . . . fundamental that a lawful arrest may not ensue where the arrestee is merely exercising his First Amendment rights." *Gainor*, 973 F.2d at 1387; *see also Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010).

The Eighth Circuit recently considered the application of First Amendment retaliation claims under section 1983 in *Peterson v. Kopp*, 754 F.3d 594, 601-03 (8th Cir. 2014). *Peterson* emphasized the distinction between a First Amendment retaliatory arrest claim and a First Amendment retaliatory use of force claim, holding that a plaintiff may pursue both as a result of a police encounter. *Id.*

In the present case, Mr. Garcia engaged in protected activity by displaying the middle finger to Officer Baker. Officer Baker, in turn, took adverse action against Mr. Garcia by pulling him over without reasonable suspicion, handcuffing and detaining him in the back of her squad without justification, and then improperly charging him with disorderly conduct and equipment violation even though no such crimes had been committed. Being subjected to such conduct by a law enforcement official would chill a person of ordinary firmness from continuing to engage in the protected activity. Finally, Officer Baker admitted during her deposition that she pulled Mr. Garcia over only because he gave her the finger and that she would not have detained him if he simply drove by the second time without flipping her off. (Baker Dep. 64, 103-105.) Even without her admission, the evidence in this case is sufficient to show that Officer Baker

pulled Mr. Garcia over as a direct result, and directly because, of Mr. Garcia's decision to give her the finger during the second encounter. Thus, the evidence in this case sufficiently establishes a First Amendment retaliation claim, and the right to be free from First Amendment retaliation was clearly established in February of 2016. *See Kopp*, 754 F.3d at 603 (right to be free from First Amendment retaliation during police encounter clearly established in 2014).

## III. DEFENDANT CITY OF NEW HOPE IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S *MONELL* CLAIM (COUNT 3).

A municipality may be liable under 42 U.S.C. § 1983 if the municipality itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). "A failure to properly train employees is one way in which an entity can exhibit deliberate indifference toward the rights of others." *Turney v. Waterbury*, 375 F.3d 756, 762 (8th Cir. 2004).

> A city also may be liable for deficient policies regarding hiring and training police officers where (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by a municipality, and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury.

*Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (citations omitted).

In the present case, there is sufficient evidence to establish that New Hope Police Officers are inadequately trained on the offense of disorderly conduct and its relationship to the First Amendment and the concept of "fighting words." For example, even though

the Minnesota Supreme Court has limited the disorderly conduct statute to only criminalize "fighting words" when the suspect is engaged in offensive words or actions, Officer Baker believes that engaging in offensive actions before a child, even without "fighting words," constitutes disorderly conduct. (Baker Dep. 129-30.) Officer Johnson testified that a person who displays a middle finger in the presence of children, without "fighting words," can be charged with disorderly conduct, even if the middle finger was directed at the police officer. (Leyderman Decl., Ex. 13, hereinafter "Johnson Dep." 18-20.) Officer Gust testified that he can arrest citizens for disorderly conduct for merely swearing at another citizen. (Leyderman Decl., Ex. 14, hereinafter "Gust Dep." 54-56.)

All of the officers testified that they have received no training from the City on any of the cases discussed in Part I.A.2. of this memorandum dealing with Minnesota's disorderly conduct statute and its limited reach as applied to cases involving the First Amendment. (Baker Dep. 112-15; Johnson Dep. 25-27; Gust Dep. 49-51; Leyderman Decl., Ex. 15, hereinafter "Jacobs Dep." 44-47.) When Mr. Garcia filed his Internal Affairs complaint against Officer Baker, New Hope Police Chief Tim Founier dismissed the complaint, finding that the "traffic stop was justified," (Ex. 12), despite the fact that Officer Baker admitted in her police report and on video that she stopped Mr. Garcia only because she was "curious" as to why he flipped her off.

As demonstrated above, New Hope Police Officers are clearly not trained that, in order to subject a citizen to prosecution for disorderly conduct arising out of offensive language, the citizen must first engage in "fighting words" and that simply offending another person is not sufficient to detain, arrest, or charge a citizen with disorderly

conduct. Furthermore, New Hope Police Officers incorrectly believe that the presence of young children can somehow turn protected First Amendment speech into disorderly conduct – the reality, of course, is that the presence of young children (as opposed to adults) diminishes the possibility of an imminent breach of the peace or eruption of violence and cannot turn protected speech into disorderly conduct. In fact, Defendants argue throughout their memorandum that the presence of children while Mr. Garcia displayed the middle finger somehow created reasonable suspicion justifying the stop.

The City of New Hope has failed to train its officers on the legal principles established in *Baribeau*, where the Eighth Circuit held that scaring a child is irrelevant for purposes of disorderly conduct if the suspect is engaged in protected speech/conduct, yet Defendants think, and argue in their briefing, that Mr. Garcia committed disorderly conduct by merely displaying his middle finger in the presence of children. The Defendant Officers' misunderstanding of the law, specifically their incorrect belief that displaying a middle finger in the presence of a child, is precisely the moving factor behind Officer Baker's decision to detain and charge Mr. Garcia with disorderly conduct. In fact, Officer Baker admitted in her deposition that she would not have cited Mr. Garcia for flipping her off if children were not present. (Baker Dep. 128.) The above evidence demonstrates that the City of New Hope has failed to adequately train and update its police officers on the First Amendment and its application to the disorderly conduct statute, and the City has furthermore failed to adequately update its officers on the various legal developments that significantly limit the application of the disorderly conduct statute. For all of these reasons, Plaintiff has presented sufficient evidence to

establish a *Monell* failure to train claim against the City of New Hope, and summary judgment as to Count 3 should be denied.

## IV. DEFENDANTS ARE NOT ENTITLED TO OFFICIAL IMMUNITY ON PLAINTIFF'S STATE LAW CLAIMS (COUNTS 4-6).

"The doctrine of official immunity provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *State by Beaulieu v. City of Mounds View*, 518 NW 2d 567, 569 (Minn. 1994) (internal quotations omitted). "Official immunity is intended to protect public officials from the fear of personal liability that might deter independent action." *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (internal quotations omitted). However, "[d]iscretionary conduct is clearly not protected if the official committed a willful or malicious wrong." *Elwood v. Rice County*, 423 N.W.2d 671, 679 (Minn. 1988); *Dokman*, 637 N.W.2d at 296 (official immunity does not shield a police officer from liability who commits a "willful or malicious wrong"). "The willful and malicious wrong standard contemplates whether the official has intentionally committed an act that he or she had reason to believe is prohibited." *Baribeau*, 596 F.3d at 482 (internal quotations omitted). "This is a subjective standard, in contrast to the objective qualified immunity standard." *Id.* (internal quotations omitted). "In the official immunity context, willful and malicious are synonymous." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).

Determination of whether official immunity is available in a given context requires a two-step inquiry: (1) whether the alleged acts are discretionary or ministerial; and (2) whether the alleged acts, even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection. *Davis v. Hennepin County,* 559 N.W.2d 117, 122 (Minn. Ct. App. 1997). "A discretionary act is one for which an official must exercise 'judgment or discretion.'" *Dokman,* 637 N.W.2d at 296 (quoting *Johnson v. State,* 553 N.W.2d 40, 46 (Minn. 1996)). "A ministerial act involves merely the execution of a specific, absolute duty." *Id.* Official immunity does not apply when the duty at issue is ministerial; instead, only discretionary duties are shielded by official immunity. *Davis v. Hennepin County*, 559 N.W.2d 117, 123 (Minn. Ct. App. 1997).

In the present case, the question before the Court is whether the Defendants' decision to detain and charge Mr. Garcia with disorderly conduct and equipment violation was discretionary or ministerial. As already explained above, Mr. Garcia's vehicle did not have an equipment violation. Furthermore, Mr. Garcia did not engage in "fighting words" and, as a result, the Defendant Officers did not have reasonable suspicion or discretion to detain or charge Mr. Garcia with disorderly conduct. Since the Defendant Officers knew that there was no reasonable suspicion that Mr. Garcia had committed a crime, they had no discretion to detain him or restrict his movement in any way. Thus, the Officers had a ministerial duty to refrain from detaining or charging Mr. Garcia with a crime, and official immunity does not apply.

Finally, even if official immunity is an available defense, it should nonetheless be denied because Defendants committed a willful or malicious wrong. Officer Baker has admitted that she pulled Mr. Garcia over because she was "curious" as to why he flipped her off. As explained in detail above, idle curiosity does not establish reasonable suspicion. Furthermore, the significant precedent limiting the disorderly conduct statute as requiring "fighting words" in situations involving offensive speech or conduct should have placed the Defendant Officers on clear notice that their actions were unlawful and unconstitutional. Because Defendants committed a willful and malicious wrong by harassing Mr. Garcia without justification, official immunity does not apply. Accordingly, Defendants' motion for summary judgment as to Counts 4-6 should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied in its entirety.

THE LAW OFFICE OF ZORISLAV R. LEYDERMAN

Dated: November 19, 2018

By: s/ Zorislav R. Leyderman
ZORISLAV R. LEYDERMAN
Attorney License No. 0391286
Attorney for Plaintiff
The Law Office of Zorislav R. Leyderman
222 South 9th Street, Suite 1600
Minneapolis, MN 55402
Tel: (612) 876-6626
Email: zrl@ZRLlaw.com