# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

REUBEN J. GARCIA,

          Plaintiff,

v.

CITY OF NEW HOPE,
OFFICER KAITLYN BAKER, in her
individual and official capacities,
OFFICER ANTHONY GUST, in his
individual and official capacities,
OFFICER ADAM JOHNSON, in his
individual and official capacities, and
OFFICER NADINE JACOBS, in her
individual and official capacities,

          Defendants.

Case No. 17-CV-03574 (NEB/ECW)


ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

---

Reuben J. Garcia brought this suit against Officers Kaitlyn Baker, Anthony Gust, Adam Johnson, and Nadine Jacobs (together, "Defendant Officers") and the City of New Hope ("City") under 42 U.S.C. § 1983 for violating his constitutional rights in connection with a traffic stop. This matter is before the Court on Defendants' Motion for Summary Judgment [ECF No. 27], and Plaintiff's Motion to Accept Supplemental Authority [ECF No. 57].[1] The Court grants Garcia's motion to accept supplemental authority. For the reasons set forth below, the Defendants' motion for summary judgment is granted.

---

[1] Garcia submitted *State v. Kettler*, No. A18-0665, 2018 WL 6836649 (Minn. Ct. App. Dec. 31, 2018), as supplemental authority.

# BACKGROUND

On February 1, 2016, Garcia drove his vehicle by Sonnesyn Elementary School in the City of New Hope and twice interacted with Officer Baker. [ECF No. 51 ("Leyderman Decl.") Ex. 1 ("Garcia Dep.") at 20:3–7, 23:11–14, 32:17–21.] Baker was in front of the school that day because she periodically helped direct student traffic. (Leyderman Decl., Ex. 8 ("Baker Dep.") at 27:17, 28:3–7, 46:19–21.) The facts surrounding Garcia's two interactions with Baker on that day are sharply disputed. Taken in the light most favorable to Garcia, they are as follows:

The first time Garcia saw Baker standing near the school, he was driving the posted speed limit of 20 miles per hour when children were present. (Garcia Dep. at 30:16–18.) Baker believed that Garcia was going over the 20 miles per hour speed limit, and conditions were slippery. (Baker Dep. at 49:9–12.) Baker pointed her finger down, motioning him to stop or slow down, so Garcia stopped and rolled down his window to speak with her. (Garcia Dep. at 25:15–25.) Baker was "very angry," "very agitated," and "yelling" that Garcia needed to slow down. (*Id*.) Garcia told her that he was driving the speed limit, but she continued yelling at him, so he eventually drove off. (*Id*.) Baker did not issue Garcia a citation at that time. (*Id*.)

Later, in the afternoon, Garcia drove his vehicle by the school again and saw Baker standing by her squad car. (Garcia Dep. at 32:17–21, 33:10–12, 24–26.) Garcia saw no children or crossing guards in the vicinity or near Baker. (*Id*. at 33:13–21.) As Garcia drove

past Baker at 10 to 15 miles per hour, he extended his right hand out of his car window and raised his middle finger for several seconds as he drove past her. (*Id*. at 36:4–5; Baker Dep. at 62:14–24, 64:5.) Garcia also said something to Baker, but she could not hear it due to traffic noise. (Baker Dep. at 70:17–23.)

Baker entered her squad car and followed Garcia. (Baker Dep. at 68:1–5.) She believed that she had reasonable suspicion to stop Garcia, and she intended to talk to him about his behavior during their two interactions. (*Id*. at 75:16–17, 82:17–21.) She thought their first interaction was "abnormal" because Garcia stopped near a crosswalk to argue with her about how fast he was driving. (*Id*. at 56:8, 10–12). She then became concerned when he came back to the school with children present and "continu[ed] to escalate the situation and reengage[] contact with [her]." (*Id*. at 64: 19–20, 23–25, 65:1–2.) In addition, Baker noted the license plate violation. (*Id*. at 43:19–23, 53:13–14, 54:17–18, 77:10–78:16; Leyderman Decl., Ex. 7 at 2-4.) While Baker was following Garcia, she dictated to herself, "driver drove by flipping me off [unintelligible] arguing about speed when the children were out during the school crossing." (Leyderman Decl., Ex. 3 ("Baker Video"), 0:30–0:45; Baker Dep. at 80:5–24.) Baker did not know how Garcia would react during the stop, so called for backup from other officers. (Baker Dep. at 81:16–22.) Baker activated her emergency lights and pulled Garcia's vehicle over. (Garcia Dep. at 36:8–10.) Garcia stopped his car on the side of the road. (*Id*. at 45:3–14.) The stop was recorded by Garcia

on his cell phone, Baker's squad car, and a second squad car.[2] The facts recorded in these videos are undisputed.

Baker approached Garcia's vehicle from the passenger side. (Baker Video, 0:55–1:01.) When Garcia asked, "What are you pulling me over for," Baker responded, "You drove by and you flicked me off, and I'm curious as to why you did that." (*Id*. at 1:06–1:11.) Garcia asked if what he did was against the law. (*Id*. at 1:11–1:17.) Baker responded, "There's a woman there with her children and the children are out on school patrol and you flicked me off, it's disorderly conduct, absolutely, disorderly conduct." (*Id*. at 1:17–1:25.) Garcia disagreed. (*Id*. at 1:26.) Baker requested Garcia's driver's license and insurance information twice; Garcia ignored her requests and ordered her to "get a supervisor here right now" because what she was doing was illegal. (*Id*. at 1:26–1:32, 1:36–40; Leyderman Decl., Ex. 2 ("Garcia Video"), 0:26–0:50.) Baker told him it was disorderly conduct and Garcia continued to disagree with her, arguing about the First Amendment. (Baker Video, 1:40–1:50.) Baker asked Garcia for his driver's license four more times; he told her that he would do so, and said, "Don't shoot me. Don't shoot me." (*Id*. at 1:52–2:07; Garcia Video, 0:50–1:02.) Garcia again asked Baker for a supervisor, as well as her name and badge number, arguing that she was required to provide this information.

---

[2] The parties identify the same video as Officer Gust's squad video (Leyderman Decl., Ex. 4) and Officer Jacobs' squad video [ECF No. 33]. Because the parties have not clarified this issue, the Court will refer to the video as the "Second Squad Video." (2d Squad Video.)

(Baker Video, 2:05–2:13.) He asked Baker, "you're not gonna shoot me, are ya?"[3] (*Id*. at 2:15–2:16; Garcia Video, 1:13–1:14.) Baker responded that her information would be on the citation, and twice more ordered him to produce his driver's license. (Baker Video, 2:11–2:25.)

The other Defendant Officers arrived on scene while Baker was standing by Garcia's passenger window. Officer Gust approached the vehicle on the driver's side. (2d Squad Video, 3:05; Baker Video, 2:22–2:27.) Garcia failed to provide his license despite being asked for it repeatedly and hollered, "also protected by the First Amendment." Baker then walked quickly around the back of the vehicle to the driver's side, stating, "Get out of the f***ing car, get out of the car." (Baker Video, 2:22–2:28; Garcia Video, 1:15–1:20.) Baker opened the driver's side door and told Garcia to get out of the car. (Baker Video, 2:28–2:30.) As Garcia stepped out of the vehicle, Baker took hold of his bicep, told him to get up against the vehicle and put his hands behind his back, and guided him so that his chest was against the vehicle. (*Id*. at 2:30–2:35.) Baker took what appeared to be Garcia's wallet from his hand and it dropped to the ground. (*Id*. at 2:30–2:35.) Baker handcuffed Garcia behind his back. (*Id*. at 2:34–2:42.) Baker testified that she decided to remove Garcia from the vehicle because he was not having a rational conversation with

---

[3] In Garcia's video, Baker appears to rest her right hand on the cover of her firearm, with her right thumb through a wide loop. (Garcia Video, 0:02–1:22.) Garcia testified that Baker placing her hand on her firearm made him fear for his life. (Garcia Dep. at 36:19, 85:22–24, 86:8–9.)

her, and his questioning about whether she was going to shoot him raised suspicion and made her very uncomfortable. (Baker Dep. at 88:1–3, 89:10–15.)

The Defendant Officers repeatedly asked Garcia if he had any weapons on him. (Baker Video, 2:43–2:53.) Garcia refused to answer, stating that he was invoking his Fifth Amendment right to remain silent. (*Id*. at 2:52–2:55; 2d Squad Video, 3:43–3:47.) Officers Baker, Gust, and Jacobs escorted Garcia to Baker's squad car, where Garcia admitted to having a boxcutter. (Baker Video, 3:00–3:24.) Baker told Garcia that he was "being detained, right now for disorderly conduct." (*Id*. at 3:35–3:41.) Gust patted Garcia down and directed Garcia inside Baker's squad car. (2d Squad Video, 4:16–5:04.)

Once Garcia was in the squad car, Baker told the other Defendant Officers,

This morning, him and I got in a little – he stopped when I told him to slow down going through the crosswalk, the kids are on school patrol. He said, "I'm only going 25." Well, it's 20. Drove by this afternoon and flicked me off. The kids are out, there's a mom there with a kid waiting at the corner…. He flicked me off, I got in my car…. Videotaping the whole time. "Don't shoot me, don't shoot me." He wants a supervisor.

(Baker Video, 4:16–4:36; 2d Squad Video, 5:09–5:31.) Baker also told the other Defendant Officers that Garcia "wouldn't give [her] his I.D., that why he's taking a 'timeout' for right now." (Baker Video, 5:00–5:06.) Baker collected Garcia's wallet and other items from the ground, found his driver's license among them, and returned to her squad car. (*Id*. at 4:37–4:58, 5:06–6:00.)

While in the squad car, Baker explained to Garcia that he was being detained for disorderly conduct, and then for not giving her his driver's license. (Baker Video, 6:45–

6:50.) Garcia remained inside the car for approximately seven minutes while Baker prepared his citation for disorderly conduct and the license plate violation. (*Id*. at 5:54–11:18; 2d Squad Video, 5:02–12:10; Leyderman Decl., Ex. 5.) Garcia told Baker that the officers were "corrupt," "entirely unprofessional," and "dangerous," and that his detention violated the First Amendment. (Baker Video, 5:59–6:20, 7:15–20, 9:20, 10:00–10:44.) Officer Gust let Garcia out of the squad car and removed the handcuffs. (2d Squad Video, 12:10–13:27.) Officer Jacobs testified that Garcia walked back towards his vehicle, told the officers to "f*** off," and extended both of his middle fingers in the air. (Leyderman Decl., Ex. 15 ("Jacobs Dep.") at 28:6–11.) Garcia entered his vehicle and drove away. (*Id*.) At no time did Garcia indicate that he was in any pain during the video recordings.

In her police incident report, Baker summarized her two interactions with Garcia before the stop and listed the license plate violation and disorderly conduct offenses. (Leyderman Decl., Ex. 7 at 2–4.) The report states, "I explained that I stopped him for 'flicking me off'." (*Id*. at 3.) It also notes Baker's observation of a plastic cover and frame on Garcia's license plate. (*Id*. at 4.) During her deposition, Baker testified that if Garcia had not gestured at her with his middle finger during their second interaction, she would not have pulled him over. (Baker Dep. at 64:6–9.) She testified that she would not have stopped Garcia if he had done everything else but had not extended his middle finger that day, (*id*. at 105:3–14), but also testified that she would have stopped Garcia even if

he had not gestured at her, (*id*. at 106:1–9), and that she was unsure as to whether she would have stopped Garcia if he had not gestured at her, (*id*. at 106:20–107:7). Baker testified that citizens have raised their middle fingers at her before and she had not stopped any of them for doing so, and that she would not respond with violence against a citizen who did so. (*Id*. at 84:10–24, 85:12–15.)

Baker testified that she noticed that Garcia's rear license plate had a plastic cover during her first interaction with Garcia, and also observed the plate violation when she followed him in her squad car. (*Id*. at 43:19–23, 53:13–14, 54:17–18, 77:10–78:16.) Officer Jacobs testified that she saw a plastic cover with a frame over the rear license plate as she approached Garcia's vehicle, and that it was an equipment violation. (Jacobs Dep. at 52:17–54:9.) Garcia denies that he had a cover over his license plates, or a frame over his license plates that covered any letters, numbers, tabs, stickers, or the name of the state of origin during his interactions with Baker. (Garcia Decl., ¶3.)

Garcia hired an attorney in connection with the citation charges. On the advice of counsel, Garcia took a defensive driving course and wrote an apology letter to Baker, both in exchange for dismissal of the criminal charges. (Garcia Dep. at 56:3–23, 57:2-4; Leyderman Decl., Exs. 9, 10.) Garcia testified that if his criminal attorney had not required additional payment, he would have rejected the prosecutor's offer and taken the case to trial. (Garcia Dep. at 112:1–7.)

On the same day he entered the agreement to suspend prosecution, Garcia filed an Internal Affairs complaint against Baker, complaining that he was unlawfully stopped and prosecuted for extending his middle finger at her. (Leyderman Decl., Exs. 10, 11.) A month later, New Hope's Chief of Police notified Garcia that his complaint against Baker was not sustained, and that the "traffic stop was justified." (*Id*., Ex. 12.)

Garcia then filed suit against the Defendants in Minnesota state court alleging: First Amendment violation and retaliation by Baker and the City (Counts 1 and 3); Fourth Amendment unreasonable search and seizure and excessive force violations by all Defendants (Count 2); assault and malicious prosecution by Baker and the City (Counts 4 and 6); and battery against all Defendants (Counts 5). [ECF No. 1–1 ("Compl.").] Garcia claims to have suffered stress, fear, shame, humiliation and loss of freedom and liberty as a result of the Defendants' actions. (Garcia Dep. at 79:11–13, 85:5–18.) He alleges physical injury to his right wrist due to the handcuffing, which required medical treatment and took approximately two months to resolve, and that he was subjected to a wrongful criminal prosecution and incurred $1,600 in attorney's fees. (*Id*. at 76:2–15, 110:11.) The Defendants removed the case to federal court. On October 29, 2018, they filed this instant motion for summary judgment.

# ANALYSIS

## I.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247–49). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus.*, 475 U.S. at 587 (citation omitted).

## II.    Qualified Immunity

The Defendants assert that the Defendant Officers are entitled to qualified immunity for the Fourth Amendment claims against them and the First Amendment retaliation claim against Baker. Qualified immunity shields governmental officials from liability for civil damages when their "conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014) (citation omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (citation omitted). "At summary judgment, qualified immunity shields a law enforcement officer from liability in a § 1983 action unless: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Barton v. Taber*, 908 F.3d 1119, 1123 (8th Cir. 2018) (citations and quotation marks omitted). The Court finds that Garcia has not demonstrated a deprivation of his constitutional rights and thus does not address whether such rights were clearly established.

### A. Fourth Amendment Search and Seizure Claim

Garcia contends that the Defendants violated his Fourth Amendment right to be free of an illegal search and seizure. "Because a traffic stop is a seizure within the meaning of the Fourth Amendment, it must be reasonable to pass constitutional muster." *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (citations omitted). Officers need "reasonable suspicion" to justify a traffic stop. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Reasonable suspicion exists when an officer has a "particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id*. (citation and quotation marks omitted); *see McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011).

"[R]easonable suspicion is more than a mere hunch but less than probable cause or a preponderance of the evidence." *United States v. Cobo-Cobo*, 873 F.3d 613, 616–17 (8th Cir. 2017) (citation omitted). The Defendants argue that the Defendant Officers are entitled to qualified immunity because Baker had a reasonable suspicion to stop Garcia based on (1) her observations of Garcia's behavior during their two interactions that day and (2) his license plate violation. *Cf. Kettler*, 2018 WL 6836649 at *2 (finding insufficient circumstances to warrant an investigative stop where the officer did not articulate reasonable suspicion of disorderly conduct or identify any crime he suspected that defendant was committing).

### 1. Disorderly Conduct

The Defendants maintain that Baker had a reasonable suspicion to stop Garcia for disorderly conduct based on her observations of his confrontational behavior during their two interactions. A person who "engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others" engages in disorderly conduct. Minn. Stat. § 609.72, subd. 1(3). The Minnesota Supreme Court has construed this statute narrowly to refer only to "fighting words." *Matter of Welfare of S.L.J.*, 263 N.W.2d 412, 419 (Minn. 1978). "'Fighting words' are those personally abusive epithets which, when addressed to the ordinary citizen, are likely to provoke violent reaction or tend to incite an immediate breach of the peace." *State v. Klimek*, 398 N.W.2d 41, 43 (Minn. Ct. App. 1986) (citing *S.L.J.*,

263 N.W.2d at 418). Courts are to view the speaker's "words, coupled with his conduct and physical movements, and measure them as a package" against Minn. Stat. § 609.72, subd. 1(3). *Id.*; *see State v. McCarthy*, 659 N.W.2d 808, 811 (Minn. Ct. App. 2003) (affirming district court's conclusion that defendant's "actions and language caused alarm and resentment in the spectators present and therefore constituted disorderly conduct").

Garcia argues that extending his middle finger did not rise to the level of "fighting words," and that such conduct protected by the First Amendment. He relies upon several Minnesota cases holding that Minn. Stat. § 609.72, subd. 1(3) cannot be used to punish protected free speech unless it constitutes "fighting words." *See, e.g., S.L.J.*, 263 N.W.2d at 418; *Matter of Welfare of M.A.H.*, 572 N.W.2d 752, 757–58 (Minn. Ct. App. 1997); *State v. Peter*, 798 N.W.2d 552, 554 (Minn. Ct. App. 2011). Garcia maintains that his conduct was not "inherently likely to provoke retaliatory violence by the police at whom the insult was directed or … intended to and likely to produce imminent lawless action by the surrounding circumstances [*sic*]." [ECF No. 50 ("Pl.'s Resp. Br.") at 17–18 (mis-quoting *M.A.H.*, 572 N.W.2d at 758).] Indeed, Baker testified that she would not respond with violence to someone giving her the middle finger.

The Defendants do not claim that raising a middle finger at a police officer constitutes fighting words, nor do they argue such conduct unprotected by the First Amendment. They insist that Baker did not stop Garcia merely for raising his middle finger; rather, Baker had a reasonable suspicion that Garcia's conduct was disorderly, *i.e.*,

was "intended to arouse alarm, anger, or resentment," based on the totality of the two interactions in front of the school. [ECF No. 29 ("Defs.' Br.") at 13]; *see Klimek*, 398 N.W.2d at 43 (upholding conviction where defendant "had reasonable grounds to know his conduct would alarm and threaten" an individual). Baker testified that during their first interaction, Garcia stopped and argued with her in response to her gesture to slow down. Later, he returned and extended his middle finger as he drove slowly by the school. Baker thought Garcia's behavior was "unsafe" and "wasn't normal for a person to come back and re-interact in an area where there is [sic] kids outside." (Baker Dep. 36:9–15.) But Garcia tells a different story regarding their first interaction, testifying that he stopped in response to Baker's gesture to do so, and that Baker yelled at him, rather than the other way around. Regarding the second interaction, the parties dispute whether children were present when Garcia raised his middle finger at Baker.

Clearly, then, genuine issues of material fact exist as to what transpired during the two interactions between Garcia and Baker. Thus, summary judgment on the issue of whether Baker had a reasonable suspicion that Garcia's conduct was disorderly is not appropriate. *See Kukla v. Hulm*, 310 F.3d 1046, 1049 (8th Cir. 2002) ("[I]f the arrestee challenges the officer's description of the facts and presents a factual account that would not permit a reasonable officer to make an arrest, then there is a material factual dispute precluding summary judgment" on qualified immunity). This conclusion does not end the inquiry, however, because the Defendants assert a second reason for the stop.

## 2. License Plate Violation

The Defendants also argue that Baker had a reasonable suspicion to stop Garcia based on a license plate violation. "The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. Any traffic violation, however minor, provides probable cause for a traffic stop." *Wright*, 512 F.3d at 471 (citations, quotation marks and brackets omitted); *see State v. Poehler*, — N.W.2d —, No. A18-0353, 2018 WL 6442313, at *2 (Minn. Ct. App. Dec. 10, 2018) ("An officer … may constitutionally stop a car if the officer reasonably suspects that the driver has violated a motor vehicle law."). Baker testified that she noticed that Garcia's rear license plate had a cover and a frame during her first interaction with him, and noticed it again before the traffic stop. Under Minn. Stat. § 169.79, subd. 7, "[i]t is unlawful to cover any assigned letters and numbers or the name of the state of origin of a license plate with any material whatever, including any clear or colorless material that affects the plate's visibility or reflectivity." Baker cited Garcia for a violation of Minn. Stat. § 169.79, subd. 7, and noted it in her incident report.

Again, however, the inquiry does not end, because Garcia maintains that his license plates did not have covers or frames at the time of his interactions with Baker. The Defendants deny that Baker was mistaken, but contend that even if she was, her belief that Garcia had a license plate violation was a reasonable mistake that passes constitutional muster.

"[S]earches and seizures based on mistakes of fact can be reasonable." *Heien*, 135 S. Ct. at 536. "[O]fficers do not violate the Fourth Amendment if they act upon a mistake of fact that is objectively reasonable, and they are also entitled to qualified immunity if a mistake … was objectively reasonable." *McKenney*, 635 F.3d at 358–59 (citations omitted); *see Williams v. Decker*, 767 F.3d 734, 740 (8th Cir. 2014) (holding that officer was entitled to qualified immunity where his mistaken perception that a driver, rather than a passenger, in a double-parked vehicle was consuming alcohol was objectively reasonable). While Garcia denies that his license plates had covers or frames, both Baker and Jacobs testified that they saw a cover with a frame on his rear license plate at the stop. Baker's squad video shows the rear of Garcia's vehicle and license plate, but the license plate is not clearly discernable. When Baker cited Garcia for the license plate violation, he chose to enter into an agreement to suspend prosecution rather than dispute the citation. This evidence indicates that even if Baker was mistaken about the existence of a license plate cover and frame, her mistake was reasonable. *See United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008) (finding officer's mistake to be objectively reasonable based upon difficulty of discerning visually whether a traffic infraction–failing to have a front license plate–occurred); *Carrick v. Freeman*, No. 4:15-CV-00596 BSM, 2016 WL 10611376, at *4 (E.D. Ark. Dec. 20, 2016) (granting summary judgment because officer had probable cause to arrest plaintiff where officer observed him "driving his vehicle without a rear license plate, which is a misdemeanor offense.… Even if [the officer] was mistaken, that mistake was

reasonable," demonstrated by evidence that other officers had stopped him for the same issue, and the plaintiff initially pled guilty), *aff'd*, 709 F. App'x 409 (8th Cir. 2018).

Thus, because Baker had a reasonable suspicion to stop Garcia based on her observation of his license plate violation, even if she may have been mistaken about that observation, the Defendant Officers are entitled to qualified immunity on the search and seizure claim.[4]

### B. Fourth Amendment Excessive Force Claim

Garcia maintains that even if the stop was not an illegal seizure, the Defendants violated his Fourth Amendment right to be free of excessive force when Baker handcuffed him. "The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (citation omitted). For the use of handcuffs during a *Terry* stop, "the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous *or*

---

[4] While Garcia makes much of the fact that Baker did not mention his license plate violation during the stop, she was not required to do so. "Fourth Amendment analysis … turns on what a reasonable officer could have believed under the circumstances, not on the state of mind or subjective beliefs of these particular officers." *McKenney*, 635 F.3d at 359. Thus, "an officer's subjective motivation … revealed at the time of the traffic stop … is irrelevant to the probable-cause inquiry." *United States v. Demilia*, 771 F.3d 1051, 1055 (8th Cir. 2014) ("Even though [officer] testified that Section 103 was the subjective basis for the stop, Section 302 could still provide the objective legal justification needed to support probable cause for the stop."); *see Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004) (rejecting the argument "that the offense establishing probable cause must be closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of the arrest").

that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Id.* (citation omitted, emphasis added). "[O]fficers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the *status quo* during the *Terry* stop." *Id*. (citing *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006)). Because "the use of handcuffs is greater than a *de minimus* intrusion," an officer must "demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id*. (citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). Courts must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 397.[5]

Garcia argues that handcuffing him during the stop was excessive because there was no reason to believe he was armed or dangerous. Officers may place a suspect in handcuffs if doing so is "reasonably necessary to protect their personal safety and to

---

[5] The Defendants argue that the Court should also consider the result of the force in determining whether excessive force was used. [ECF No. 56 (Defs.' Reply Br.) at 12.] But evidence of only *de minimis* injury does not foreclose a claim of excessive force. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) (noting it is possible to prove an excessive use of force that caused only a minor injury). The Court is to "focus instead on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used." *Id*. (citing *Graham*, 490 U.S. at 396).

maintain the *status quo* during the stop." *Martinez*, 462 F.3d at 907. Moreover, "[t]he use

of some force is reasonable when an arrestee disobeys orders." *Anderson v. City of Hopkins*,

805 F. Supp. 2d 712, 720 (D. Minn. 2011) (citing *Foster v. Metro. Airports Comm'n*, 914 F.2d

1076, 1082 (8th Cir. 1990)). The videos of the stop clearly demonstrate that Garcia ignored

Baker's repeated requests for his driver's license and argued with her about the legality

of the stop. *See United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (an officer may

conduct a reasonable investigation during a traffic stop, which includes "asking for a

driver's license and registration, [and] requesting the driver sit in the patrol car"); *United

States v. Bueno*, 443 F.3d 1017, 1025 (8th Cir. 2006) ("Once a vehicle has been stopped for

a traffic violation, a police officer may order the driver out of the vehicle without violating

the Fourth Amendment."). Courts have found that an officer did not use excessive force

where the officer removed the driver from his vehicle, handcuffed him and held him in a

squad car after he argued with the officer about the reason for the stop. *See, e.g., Foster*,

914 F.2d at 1082 (concluding that pulling a driver from a vehicle and handcuffing him in

response to him tearing up a parking ticket and refusing to exit the vehicle was not

excessive force); *see also Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006) (holding

that where plaintiff "finally stopped but failed to comply with orders to get out of his

vehicle, it was objectively reasonable for [officer] to pull [plaintiff] from the truck and

handcuff him"). Garcia's argumentative responses to the stop and disregard of Baker's

repeated orders to produce his driver's license warranted a reasonable person's belief

that the officers' safety may be in danger. *See United States v. Gilliam*, 520 F.3d 844, 847–48 (8th Cir. 2008) (reasonable concern for officer safety existed where suspect avoided contact with police and ignored commands to stop); *Ward v. City of Minneapolis*, No. CIV. 11-1752 JRT/LIB, 2013 WL 3871429, at *5 (D. Minn. July 26, 2013) (finding no excessive force where plaintiff was handcuffed and held in a squad car after he failed to provide his license when requested it and instead argued with officer about why he was pulled over, then resisted officer's effort to open the vehicle's door and disobeyed officer's repeated requests to exit the vehicle). Thus, Baker did not use excessive force in handcuffing Garcia for a brief period during the stop.

### C.  Fourth Amendment Claim against Assisting Officers

The Defendants contend that no constitutional claim exists against Officers Johnson, Gust, and Jacobs because they did not stop Garcia and provided minimal assistance during Garcia's detention, and because Officer Gust's pat down and removal of handcuffs did not violate a clearly established constitutional right. [ECF No. 29 at 20.] In his response brief, Garcia does not address these arguments or explain the basis for his claims against Officers Johnson, Gust, and Jacobs. As such, he has waived these arguments. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Trnka v. Biotel Inc.*, Civ. No. 07–1206, 2008 WL 108995, at *3 n.4 (D. Minn.

Jan. 9, 2008) (finding a claim abandoned because plaintiff failed to respond to defendant's summary judgment arguments regarding the claim in her opposition brief).

Moreover, the Court finds that Garcia has not raised a genuine issue of material fact precluding summary judgment on the Fourth Amendment claim against Officers Johnson, Gust, and Jacobs. "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association." *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) (citation and quotation marks omitted). While the Complaint alleges that "[a]ll Defendant Officers participated in arresting and handcuffing Mr. Garcia," (Compl., ¶11), the videos show that Baker handcuffed Garcia and told him he was being detained. Moreover, Garcia repeatedly characterizes the alleged seizure as an arrest, (Pl.'s Resp. Br. at 26, 31, 34), and fails to respond to the Defendants' argument that Garcia was detained, not arrested. (Defs.' Br. at 13–15). *See Satcher*, 558 F.3d at 735 (failure to oppose a basis for summary judgment constitutes a waiver of the argument).

Garcia's Statement of Facts asserts that "Officers Baker, Gust, and Jacobs escorted Mr. Garcia to Officer Baker's squad" and that "Officer Baker and Officer Jacobs physically restrained Mr. Garcia while Officer Gust searched his person."[6] (Pl.'s Resp. Br. at 4.)

---

[6] The Second Squad Video shows Officers Jacobs and Baker standing on either side of Garcia while Gust is patting him down, but does not clearly show Garcia being physically restrained. At one point during the pat-down, Baker is clearly not restraining Garcia, as she steps away from Garcia and removes her vest. (2d Squad Video, 4:16–5:02.) Considering the evidence in the light most favorable to Garcia, the Court will assume that

"Generally, an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable." *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017) (citation omitted). Here, the Second Squad Video demonstrates that Gust and Jacobs arrived at the scene after Baker had stopped Garcia. Gust witnessed Garcia ignoring Baker's repeated requests for his driver's license and arguing with her about the legality of the stop. *See Ward*, 484 F.3d at 1061 (an officer may conduct a reasonable investigation during a traffic stop, including asking for a driver's license); *Foster*, 914 F.2d at 1082 (handcuffing was reasonable where driver argued with officer and refused repeated orders). Before Gust conducted the pat-down, Garcia refused to answer the Defendant Officers' questions about whether he was carrying any weapons. "[A] pat-down is permissible if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Gaffney*, 789 F.3d 866, 870 (8th Cir. 2015) (citation omitted). Garcia's argumentative behavior, coupled with his refusal to answer whether he was carrying any weapons, reasonably warranted a belief that the Defendant Officers' safety may be in danger. Garcia does not proffer evidence suggesting that Officers Gust or Jacobs were involved in Baker's decision to stop Garcia, or that they understood the basis for the stop when they escorted Garcia to Baker's squad car and

---

the officers were restraining Garcia for part of the pat-down. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (where a party's story is contradicted by the video evidence in the record, the Court is to "view[] the facts in the light depicted by the videotape").

patted him down. As Garcia notes, Baker did not "debrief[] with the other Officers" until "Garcia was in the squad." (Pl.'s Resp. Br.at 4.) Given these undisputed facts, Gust's and Jacobs' reliance on Baker in escorting and patting down Garcia was reasonable. *See Passenheim v. Tolbert*, No. 15-CV-0422 (PJS/SER), 2016 WL 6915504, at *4 (D. Minn. Nov. 21, 2016) (granting summary judgment to officer where plaintiff "cited no evidence that [the officer] knew of (much less condoned) the questionable basis of the traffic stop or the questionable basis of the pat-down search"). Thus, Officers Gust and Jacobs are entitled to summary judgment on the Fourth Amendment claim.

As for Officer Johnson, Garcia's Statement of Facts does not identify any conduct by her during the stop. Because Garcia fails to proffer any evidence supporting his constitutional claim against Officer Johnson, summary judgment is appropriate on that claim as well.

### D. First Amendment Claim

Garcia asserts a First Amendment retaliation claim against Baker. "A citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is clearly established." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (citation and quotation marks omitted). To prevail on a First Amendment retaliation claim brought under § 1983, a plaintiff must show: (1) "he engaged in a protected activity;" (2) "the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity;" and (3) "the

adverse action was motivated at least in part by the exercise of the protected activity."
*Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (citation omitted).

In retaliatory arrest cases, the Eighth Circuit has identified a fourth prong: lack of probable cause or arguable probable cause. *Peterson*, 754 F.3d at 602. And "[i]t follows that if lack of probable cause is an element of retaliatory arrest claim, lack of reasonable suspicion is an element of a claim based on a retaliatory traffic stop." *Mawson v. Pittston City Police Dep't*, No. 3:16-CV-00400, 2017 WL 4324840, at *12 (M.D. Pa. Jan. 20, 2017) (citing *Allen v. Cisneros*, 815 F.3d 239, 244–45 (5th Cir. 2016), and *George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013)), *report and recommendation adopted*, 2017 WL 4366446 (M.D. Pa. Sept. 28, 2017).

Here, as to prongs one and three, the parties do not dispute that the First Amendment protects the gesture of raising a middle finger at a police officer. *See Peterson*, 754 F.3d at 602 ("[C]riticizing a police officer ... is protected speech under the First Amendment."); *Burnham v. Ianni*, 119 F.3d 668, 674 (8th Cir. 1997) ("Nonverbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it…."). The Defendants maintain that Baker's motivation for stopping Garcia was the license plate violation and his abnormal and escalating conduct during their two interactions, and not merely because of the one-time gesture at her. At her deposition, Baker waffled as to whether she would have stopped Garcia if he had not raised his middle finger. Considering her

testimony in the light most favorable to Garcia, a jury could conclude that Baker's decision to stop Garcia was motivated at least in part by his disrespectful gesture.

As to the second prong, whether Baker's actions would "chill a person of ordinary firmness" from continuing a protected activity, the test is an objective one. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). "The question is not whether the plaintiff [him]self was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." *Id*. The question of an adverse act's chilling effect is typically a jury question. *See id*. (issue of whether four parking tickets totaling $35 in fines amounted to adverse action sufficient to chill a person of ordinary firmness was a jury question); *but see Williams v. City of Carl Junction, Mo.*, 480 F.3d 871, 878 (8th Cir. 2007) (finding insufficient adverse action where plaintiff claimed that a police officer issued her a traffic violation in retaliation for speaking out against municipal practices).

Garcia argues that a person of reasonable firmness would be chilled from continuing to engage in protected activity by being pulled over without reasonable suspicion, handcuffed and detained without justification, and improperly issued a citation. (Pl.'s Resp. Br. at 31.) While not dispositive of the issue, Garcia himself was clearly not chilled from engaging in protected activity, as he told the Defendant Officers to "f*** off" and extended both of his middle fingers after being pulled over, handcuffed, patted down, detained, and issued a citation. As to this second prong, the Court assumes

without deciding that Garcia has met his burden to identify a material issue of fact on the issue of the chilling of speech.

But Garcia fails on the fourth prong, failure of reasonable suspicion for the stop. Garcia is required to show that Baker did not have reasonable suspicion to make the traffic stop in order for his retaliation claim to survive. Because the Court has found that Baker had reasonable suspicion to stop Garcia for the license plate violation, and that her use of handcuffs did not amount to excessive force, the Court cannot find that Baker's conduct could result in a First Amendment retaliation claim. *See George*, 738 F.3d at 586 (where officials' search and questioning did not violate plaintiff's Fourth Amendment rights, the court was "hard-pressed to find that it could result in a First Amendment retaliation claim"); *Allen*, 815 F.3d at 244–45 (concluding that "where a citizen believes that he has been subject to a retaliatory detention or arrest, if there was reasonable suspicion or probable cause for an officer to seize the citizen, the objectives of law enforcement take primacy over the citizen's right to avoid retaliation"); *Mawson*, 2017 WL 4324840, at *12 (concluding lack of reasonable suspicion is an element of a First Amendment claim based on a retaliatory traffic stop). For these reasons, the Court grants summary judgment on Garcia's First Amendment claim against Baker.

### III.     42 U.S.C. § 1983 Claims against the City

Garcia alleges that the City is liable for First and Fourth Amendment violations under § 1983 because it failed to adequately train its police officers. "Without a

constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability." *Saunders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) (citations omitted). Because Garcia cannot establish that the Defendant Officers violated his constitutional rights, his § 1983 claims against the City fail.

Even if a genuine issue of material fact existed as to whether the Defendant Officers violated Garcia's constitutional rights, summary judgment on these claims is appropriate. Under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), municipalities "are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). A municipality's failure to train its employees must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id*. at 61 (citation omitted). The deliberate indifference standard requires proof that "a municipal actor disregarded a known or obvious consequence of his action." *Id*. (citation omitted). A municipality may be considered deliberately indifferent where its policymakers have "actual or constructive notice that a particular omission in their training program cause[d] city employees to violate citizens' constitutional rights," and choose to retain that program. *Id*. (citation omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id*. at 62 (citation and quotation marks omitted).

Garcia proffers no evidence that the City had actual or constructive notice that its police officers were violating citizens' constitutional rights. He offers no evidence of other similar stops by City officers, but rather, relies on his own single occurrence. *See Remington v. Hoopes,* 611 F. App'x 883, 886 (8th Cir. 2015) (per curiam) (refusing to infer the existence of an unconstitutional government policy or custom from a single occurrence); *Wedemeier v. City of Ballwin,* 931 F.2d 24, 26 (8th Cir. 1991) ("Generally, an isolated incident of police misconduct by subordinate officers is insufficient to establish municipal [liability]."). Because Garcia has not shown that the City was deliberately indifferent to an omission in their police officer training program, summary judgment on Garcia's § 1983 claims against the City is granted.

## IV.  Official Immunity

The Defendants assert that the Defendant Officers are entitled to official immunity for the state law claims of assault, battery and malicious prosecution. Official immunity is intended "to protect public officials from the fear of personal liability that might deter independent action." *Dokman v. Cty. of Hennepin,* 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (citation omitted). "In general, official immunity turns on: (1) the conduct at issue; (2) whether the conduct is discretionary or ministerial ...; and (3) if discretionary, whether the conduct was willful or malicious." *Kariniemi v. City of Rockford,* 882 N.W.2d 593, 600 (Minn. 2016) (citation and quotation marks omitted). Courts have found that the discretionary designation is "particularly appropriate in stop and arrest scenarios."

*Williams-Brewer v. Minneapolis Park & Recreation Bd. of the City of Minneapolis*, No. CIV. 09-3524 JRT/JJG, 2011 WL 3610097, at *2 (D. Minn. Aug. 15, 2011); *see Kelly v. City of Minneapolis*, 598 N.W.2d 657, 665 (Minn. 1999) ("[T]he conduct of police officers in responding to a dispatch or making an arrest involves precisely the type of discretionary decisions" that the Minnesota Supreme Court "intended to protect from judicial second-guessing through the doctrine of official immunity.") While Garcia argues that the Defendant Officers' conduct was ministerial, he cites no legal authority to support this position. The Court finds that the traffic stop and detention of Garcia was discretionary.

The Court also finds that no genuine issue of material fact exists as to whether the Defendant Officers' conduct was willful or malicious. Malice is defined as "the intentional doing of a wrongful act without legal justification or excuse, or … the willful violation of a known right." *Dokman*, 637 N.W.2d at 296 (citation omitted). The question of malice is an "objective inquiry into the legal reasonableness of an official's actions." *Id.* (citation omitted). For the reasons provided above, the Court has found that the Defendant Officers' conduct was reasonable. As such, it cannot be considered willful or malicious. S*ee Heitzman v. Engelstad*, No. 12-CV-2274 MJD/LIB, 2015 WL 506279, at *7 (D. Minn. Feb. 6, 2015) (holding official immunity barred state law claims where officer did not use excessive force to put plaintiff in handcuffs and take her into custody and had no reason to believe that handcuffing plaintiff was unlawful or violated plaintiff's rights).

The Defendants argue that the City of New Hope is entitled to vicarious official immunity. The Court agrees. "Official immunity also protects government entities from vicarious liability for actions that are entitled to immunity." *Hayek v. City of St. Paul*, 488 F.3d 1049, 1056 (8th Cir. 2007) (citing *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998)). Because the Defendant Officers are entitled to official immunity for their actions, the City is entitled to vicarious official immunity for the same conduct.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff's Motion to Accept Supplemental Authority [ECF No. 57] is GRANTED;

2. Defendants' Motion for Summary Judgment [ECF No. 27] is GRANTED; and

3. This action is DISMISSED WITH PREJUDICE.

LET JUDMENT BE ENTERED ACCORDINGLY.


Dated: March 18, 2019                          BY THE COURT:

                                               s/Nancy E. Brasel
                                               Nancy E. Brasel
                                               United States District Judge